OPINION OF THE COURT
Fisher, J.
On December 21, 2000, 59-year-old Roy Myers was dining with his wife at a restaurant in Manhattan when a piece of prime rib steak became lodged in his throat. He and his wife left the restaurant and returned to their hotel room where Myers passed a difficult night, gagging and coughing, and experiencing difficulty breathing. He tried to drink water and eat an apple but was unable to keep either down. The next morning, Myers and his wife returned to their Syosset home and, upon a physician’s recommendation, went to the emergency room of North Shore University Hospital at Syosset (hereinafter Syosset Hospital). They arrived at the hospital shortly before 2:00 p.m. At approximately 6:00 p.m., with Myers’ consent, Dr. Neil Ferrara, a gastroenterologist, attempted to remove impacted meat from Myers’ esophagus by performing a flexible endoscopy. The procedure was unsuccessful, however, and Dr. Ferrara sought advice from other gastroenterologists. Based on his own judgment and the recommendations of the other physicians with whom he consulted, Ferrara sought the assistance of a thoracic surgeon. He contacted four, but none was available to come to Syosset Hospital. He then spoke with Dr. Adam E. Saltman, a cardiothoracic surgeon at Stony Brook University Hospital (hereinafter Stony Brook). After Dr. Ferrara thoroughly reviewed the case with him, Dr. Saltman agreed to accept Myers *80 as a transfer patient, and arrangements were made to transfer Myers to Stony Brook, along with a copy of his medical records.
At about 8:30 p.m., Dr. Ferrara left Syosset Hospital, but shortly thereafter was notified that Myers had suffered an “episode of shortness of breath.” Ferrara called Dr. Sanjiv Sharma, a pulmonologist, who agreed to come to Syosset Hospital for a consultation. Dr. Sharma arrived at the hospital between 10:15 and 10:30 p.m. He examined Myers at 10:55 p.m. and formulated a differential diagnosis to rule out: (1) aspiration (entry of secretions or foreign material into the lungs), (2) perforation of the esophagus, and (3) mediastinitis (inflammation or infection of the mediastinum, or area within the chest). Dr. Sharma completed a consult note and issued his orders at 11:00 p.m. His note read, in part: “will discuss with Thoracic [surgeon] ASAP need for contrast study esophagus STAT.” Dr. Sharma wrote “NPO, IV fluids,” meaning that Myers should not be given any food or fluids by mouth. As Dr. Sharma later explained, “until I could exclude perforation, I certainly didn’t want to give him bacteria-laden food to go and add more insult to the injury.” Additionally, Dr. Sharma wrote orders which provided, in part: “rule out esophageal perforation” and “Thoracic surgery consult ASAE] cardiac monitoring.” He ordered various tests and further monitoring, and directed that antibiotics be administered in case there was either an esophageal perforation or aspiration pneumonia. Moreover, as Sharma would later testify, he discussed his differential diagnosis with Dr. Ferrara:
“I did make it clear both in my note and also verbally I remember to Dr. Ferrara that... we have to be careful that he doesn’t have a perforated esophagus, and perforated esophagus should be attended to ASAP and the mortality depends upon the speed with which we take care of the patient. And . therefore I made sure that we contacted a thoracic surgeon or referred him to a thoracic surgeon ... I wrote a consult. I wrote my second diagnosis was to rule out perforation, and it was high up on my mind . . . even though we didn’t have all the features of a perforation, but it was very high up on my mind. And that’s why I do remember this very clearly, that I told Dr. Ferrara and that is why Dr. Ferrara and I both sat over there until we arranged the transfer, that we need a thoracic surgeon as soon as possible, and we made sure that we got one.”
*81 Dr. Ferrara recalled that Dr. Sharma “seemed to convey to me that there were possibilities of atelectasis, aspiration, pneumonia. He had concern that there was the possibility that the patient could have suffered a perforation, but we found no evidence of it.”
Dr. Sharma testified that he did not take it upon himself to order a contrast study/esophagram, insisting that such a test should be done in the presence of a thoracic surgeon. He explained that a thoracic surgeon should be present because, if surgery proved to be necessary, the thoracic surgeon would perform it. Further, Sharma testified that “a contrast study has its own problems, risks, complications, benefits, accuracy. It’s not something that we can rush into without a thoracic surgeon to supervise what we were doing.”
Dr. Sharma remained at Syosset Hospital for several more hours, leaving at about 2:00 a.m. on December 23, 2000. Dr. Ferrara was still there when, at 3:50 a.m., Myers was placed in the ambulance for transfer. Myers was admitted to Stony Brook, and the earliest notes as to his progress were made at 6:30 a.m. that morning. A report that arrived with him read in part: “x-rays reveal poss. esoph. tear.”
At Stony Brook, without reading or reviewing any of the medical documentation that arrived with Myers, Dr. Saltman, the thoracic surgeon, told him that he wanted to perform a rigid esophagoscopy to remove the meat impaction. Saltman explained the procedure and the attendant risks, and Myers consented to it. At approximately 11:30 a.m., on December 23, 2000—more than 12 hours after Dr. Sharma wrote his orders and more than 7V2 hours after Myers left Syosset Hospital—Dr. Saltman performed the procedure, assisted by Dr. Paul Mancuso. Salt-man did not see any impacted meat in Myers’ esophagus. Moreover, he looked for, but did not find, an esophageal perforation. He concluded that Myers’ esophagus was “entirely normal.” The procedure was completed about 12:30 p.m., and Myers was sent to the acute intensive care unit. Departing from Dr. Sharma’s order that Myers not be given any food or drink, Dr. Salt-man ordered that Myers be placed on a clear liquid diet, which included ginger ale. Saltman dictated a postoperative report and called Dr. Ferrara to tell him that Myers’ esophagus appeared to be normal.
Shortly after 1:00 p.m., Myers’ wife and sister-in-law visited him, and he complained to them and to a nurse that he had stomach cramps and bad gas pains and that his upper chest *82 hurt a little. He drank water and some ginger ale. Sometime between 4:00 p.m. and 4:30 p.m., Dr. Saltman left Stony Brook. Ten to 15 minutes later, a nurse practitioner called to tell him that Myers was complaining of chest pain. Dr. Saltman now told her that he was concerned that Myers had an esophageal perforation and ordered that a chest X ray be performed. He also told the nurse practitioner to get an emergency consultation from the senior surgical resident at Stony Brook, so that the resident could intubate Myers if needed. Dr. Saltman then returned to the hospital.
At approximately 5:30 p.m., Dr. Saltman received a telephone call from the nurse practitioner who told him that the X ray showed air and fluid in Myers’ pleural cavity. Shortly thereafter, Myers spoke to his wife over the telephone and told her he was not feeling well. A little over an hour after that call, he was found on the floor in a cyanotic state. Assisted by Dr. Mancuso and the resident, Dr. Saltman opened Myers’ chest and removed a large amount of clear fluid, consistent with ginger ale. During this second operation, Dr. Saltman also noticed “purulence” or pus in the lower area of Myers’ right chest, a condition consistent with a “longer standing infection.” Dr. Saltman’s report after this second operation stated that the diagnosis was an esophageal perforation. He testified at his deposition that the pus found was most likely caused by the foreign material in Myers’ chest which, in turn, was “probably” caused by the esophageal perforation. Dr. Saltman further testified that the condition of Myers’ chest cavity “suggested [that] the tear was there longer than a few minutes or hours.” Myers had suffered significant brain damage, and he died five days later when his family agreed to the removal of life support. The doctor who conducted the autopsy told Dr. Saltman that Myers’ esophagus had been perforated and “shards of meat-like material” were found in his stomach.
Subsequently, Myers’ wife, individually and as executrix of his estate, commenced this wrongful death and medical malpractice action against Syosset Hospital, Dr. Ferrara, Dr. Saltman, and a number of other physicians and nurses. Among the physicians named as defendants was Dr. Sanjiv Sharma. In her amended bill of particulars, the plaintiff alleged that Dr. Sharma was negligent in, among other things, failing to order an immediate esophagram, failing to obtain an early thoracic evaluation, failing to diagnose an esophageal perforation, and failing to communicate his concern about a potential esophageal perforation directly to Dr. Saltman.
*83 After discovery, Dr. Sharma moved for summary judgment dismissing the complaint insofar as asserted against him. The Supreme Court denied the motion, finding that, although Dr. Sharma had made a prima facie showing of entitlement to judgment as a matter of law, the expert affidavits submitted by the plaintiff in opposition raised triable issues of fact. Dr. Sharma appeals, and we reverse.
It is a familiar principle of New York law that, in order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated from good and accepted medical practice, and that the departure was a proximate cause of the plaintiff’s injuries (see e.g. Lovett v Interfaith Med. Ctr., 52 AD3d 578 [2008]; Sheenan-Conrades v Winifred Masterson Burke Rehabilitation Hosp., 51 AD3d 769, 770 [2008]; Roca v Perel, 51 AD3d 757, 758 [2008]; Rebozo v Wilen, 41 AD3d 457, 458 [2007]; Thompson v Orner, 36 AD3d 791, 791-792 [2007]; Anderson v Lamaute, 306 AD2d 232, 233 [2003]). Consequently, on a motion for summary judgment in a medical malpractice case, the defendant physician must come forward with evidence in admissible form establishing, prima facie, either that he or she did not deviate from good and accepted medical practice, or that, if there was such a departure, it was not a proximate cause of the plaintiffs injuries (see e.g. Germaine v Yu, 49 AD3d 685, 686 [2008]; Rebozo v Wilen, 41 AD3d at 458; Williams v Sahay, 12 AD3d 366, 368 [2004]). Dr. Sharma demonstrated prima facie both that he did not depart from good and accepted medical practice and that nothing he did or failed to do at Syosset Hospital proximately caused Myers’ injuries or death.
It is undisputed that, upon examining Myers, Dr. Sharma almost immediately considered the possibility of an esophageal perforation and concluded that it was necessary to rule it out. He took proper precautions, including the administering of antibiotics and ordering that Myers not be given any food or liquid by mouth. Further, he helped arrange for Myers’ transfer to the care of a thoracic surgeon, and he made proper notations in Myers’ medical records. Dr. Ian H. Newmark, who provided an affidavit in support of Dr. Sharma’s motion, concluded that Dr. Sharma did not depart at all from good and accepted medical practice.
In opposition to the motion, the plaintiff submitted an affidavit of an unnamed expert physician, board certified in pulmonology. The expert found fault with two aspects of Dr. Sharma’s *84 care. First, Dr. Sharma failed to “assure the performance of an immediate contrast study.” The expert asserted that there was no medical reason that a thoracic surgeon needed to be present during the performance of the test, and that the sooner the study was performed, the better Myers’ chances were for recovery. Further, in the expert’s opinion, inasmuch as almost five hours elapsed between the time Dr. Sharma noted the need for a contrast study and Myers’ transfer to Stony Brook, there was “more than ample” time for the study to be done before the transfer. Had the study been done at Syosset Hospital, the expert opined, the perforation would have been diagnosed earlier and Myers’ death would likely have been avoided. Second, according to the plaintiffs expert, Dr. Sharma departed from good and accepted medical practice by not speaking directly to Dr. Saltman to express his concern about the possibility of an esophageal perforation. According to the expert, Dr. Sharma should have, at the very least, confirmed with Dr. Ferrara that his concerns about a perforation had been conveyed to Dr. Saltman. Had Dr. Sharma done that, the expert opined, the doctors at Stony Brook “would have adequately searched for the perforation and more than likely would have found and treated the perforation more rapidly, before [Myers] arrested and sustained permanent brain damage.” As noted, in denying Dr. Sharma’s motion for summary judgment dismissing the complaint, the Supreme Court found that the plaintiffs expert raised triable issues of fact (see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Etminan v Sasson, 51 AD3d 623 [2008]). We disagree.
An expert affidavit submitted in opposition to a defendant physician’s motion for summary judgment must aver that the defendant departed from good and accepted medical practice, and that the departure was a “competent producing cause of the injury” (Rebozo v Wilen, 41 AD3d at 458; see Domaradzki v Glen Cove Ob/Gyn Assoc., 242 AD2d 282 [1997]). General and conclusory allegations of medical malpractice, however, unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant physician’s summary judgment motion (see Alvarez v Prospect Hosp., 68 NY2d at 325; Thompson v Orner, 36 AD3d 791, 792 [2007]; DiMitri v Monsouri, 302 AD2d 420, 421 [2003]).
Here, the plaintiffs expert opined that there was no medical reason that a thoracic surgeon needed to be present during the contrast study. Dr. Sharma did not claim otherwise; instead, he *85 explained that, inasmuch as a thoracic surgeon would have been the one to perform surgery had a perforation been found, it was appropriate to have the study done where the thoracic surgeon was located. The plaintiffs expert also concluded that there had been ample time to perform the contrast study at Syosset Hospital before Myers was transferred to Stony Brook. But the expert did not state how long such a study would have taken and his opinion rests on the assumption, without basis in the record, that Dr. Sharma knew when Myers’ transfer to Stony Brook would actually take place. Absent evidence as to the time it would normally take to get a contrast study done at a facility like Syosset Hospital at or near midnight on a weekend, or that Dr. Sharma knew when Myers would be transferred, the expert’s opinion that Dr. Sharma departed from good and accepted medical practice by failing to order that the contrast study be performed at Syosset Hospital rests on speculation. Significantly, one reason Dr. Sharma gave for not ordering the study at Syosset Hospital was to avoid delaying the transfer: “doing the esophagram and delaying transferring him . . . would have been counterproductive.”
Moreover, there is no competent evidence in the record to suggest that the failure to order a contrast study at Syosset Hospital was a proximate cause of Myers’ death. Dr. Sharma noted clearly and in several places that it was necessary to rule out a perforation, and even the ambulance run sheet referred to a possible perforation. Had Dr. Sharma’s plan of treatment been followed, the study would have been done upon Myers’ arrival at Stony Brook. Consequently, the only relevant question in assessing causation here is whether the delay—between the time a contrast study could have been done at Syosset and the time such a study could have been done at Stony Brook—was a proximate cause of Myers’ death. The plaintiffs expert offered no competent proof that it was (cf. Germaine v Yu, 49 AD3d at 687; Keevan v Rifkin, 41 AD3d 661, 662 [2007]; Godlewska v Niznikiewicz, 8 AD3d 430, 431 [2004]; Lyons v McCauley, 252 AD2d 516, 517 [1998]; Naughton v Arden Hill Hosp., 215 AD2d 810, 812 [1995]).
The plaintiffs expert also faulted Dr. Sharma for not actually speaking with Dr. Saltman to tell him of his concerns regarding an esophageal perforation or to confirm that Dr. Ferrara had actually communicated those concerns. But, even if it was a departure for Dr. Sharma not to speak directly and personally with Dr. Saltman, there still is no evidence of causation. To the *86 contrary, the record affirmatively demonstrates that Dr. Sharma’s failure to speak directly with Dr. Saltman did not cause Myers’ injuries. Dr. Saltman testified at his examination before trial that, “regardless of when Mr. Myers had suffered microaspiration or a tear or any other possible diagnosis in a list of differential diagnoses, the procedure for diagnosing and treating that was going to be the same ... It was going to be the esophagoscopy.” And Dr. Saltman testified specifically that he looked for a perforation. Therefore, the conclusory assertion of the plaintiffs expert that Dr. Saltman would have found the perforation had Dr. Sharma told him about his concerns flies in the face of what Dr. Saltman himself said. Significantly, Dr. Saltman’s statement was not an opinion expressed in a battle of experts concerning what should have, or would have, happened; rather, it was a direct statement, by the doctor actually involved in the treatment, that knowledge of Dr. Sharma’s concerns would have made no difference in what he did. Dr. Saltman’s testimony that he would have done nothing differently had he known of Dr. Sharma’s concerns—either by reading Dr. Sharma’s notes, which he did not, or by speaking directly with him— renders the plaintiffs expert affidavit insufficient to raise a triable issue of fact on the issue of causation.
In sum, inasmuch as the plaintiff, in opposition to Dr. Sharma’s showing of entitlement to judgment as a matter of law, failed to raise a triable issue of fact as to either departure or causation, the Supreme Court should have granted Dr. Sharma’s motion for summary judgment dismissing the complaint insofar as asserted against him (see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Stated simply, we find as a matter of law that, on the record presented, Mr. Myers’ tragic death was not Dr. Sharma’s fault.
Accordingly, the order is reversed insofar as appealed from, on the law, and Dr. Sharma’s motion for summary judgment dismissing the complaint insofar as asserted against him is granted.
Prudenti, EJ., Miller and Balkin, JJ., concur.
Ordered that the order is reversed insofar as appealed from, on the law, with costs, and the motion of Sanjiv Sharma for summary judgment dismissing the complaint insofar as asserted against him is granted.